Gardner *et al. vs.* Lamback.

---

ELVIRA F. GARDNER *et al.*, caveators, plaintiffs in error, *vs.* GEORGE F. LAMBACK, executor, propounder, defendant in error.

1. When on the trial of a caveat to a will, one of the grounds of the caveat was the insanity of the testator, at the time of the making of the will and another of the grounds was monomania, and that the will was the result of the monomania:

*Held*, That when the Judge was requested by the caveators to charge the jury that "the test of insanity was delusion—the belief in the existence of that which does not exist, as for instance, the belief of a man of large means that he has not the means to buy the common necessaries of life, and medicines prescribed by his physician," and the Judge

Gardner *et al. vs.* Lamback.

refused to charge in the language requested, but said, "that such delusion was one of the evidences, but was not conclusive." This was not error ; it was not proper for the Court to select out any particular instance of delusion, and charge the jury that it was a test of insanity.

2. When the Judge was asked to charge the jury, " that in order that a delusion should be such as to invalidiate a will, it is not necessary it should be a delusion as to the persons to be affected by the will ; it is sufficient if the delusion be such as to affect the subject matter to be disposed of by the will," and the Judge refused to charge in the language requested, but did charge, " that if the testator was a monomaniac, it must appear that the will is not in any way the result of, or connected with that monomania, and that the will does speak the wishes of the testator at the date thereof, unbiased by the disease with which he is afflicted :"

*Held,* That the language requested, to-wit: " It is sufficient if the delusion be such as effected the subject matter to be disposed of" was such as was calculated to mislead the jury, and that the charge as given by the Judge was a proper direction as to the law upon the point requested.

3. It was not improper for the Judge to refuse to charge as requested, that certain specified acts of the testator would, if proven, be strong evidence of insanity. It was for the jury, and not the Judge, to determine as to the weight of any particular proof.

4. It was not error in the Court to charge the jury, " that a testator may, by his will, make any disposition of his property that he chooses, not contrary to law, and that it is not contrary to law, nor to the public policy of the State for a testator to give more of his property to one child than to others."

5. It was not error in the Court to charge the jury that the words " not of sound and disposing mind," are legal terms and import a total deprivation of reason, such charge having been requested in writing by the executor, and the record showing that one of the grounds of the caveat was insanity generally, and it further appearing that the Court instructed the jury properly as to the law of partial insanity, to-wit: " that if the testator was partially insane, and the will was in any way the effect or result of that insanity it was void."

6. A new trial will not be granted on the ground of newly discovered testimony, if said newly discovered testimony be cumulative only, and when there was a trial on an issue of insanity and of partial insanity, and much evidence and many circumstances of the testator's acts, and conversations bearing on the question were introduced as evidence :

*Held* That new facts and circumstances bearing on the same point are only cumulative testimony, and do not authorize a new trial.

7. The verdict of the jury in this case, is not contrary to law, nor to any legal charge of the Court, nor is it so contrary to the evidence, if it be so at all, as to justify this Court in overruling the judgment of the Court below in its order refusing a new trial.

Caveat to will. Insanity. Monomania. Delusion. Charge of Court. Newly discovered evidence. Cumulative testimony. Before Judge Twiggs. Richmond Superior Court. January Term, 1872.

At the December term, 1871, of the Court of Ordinary of Richmond county, George F. Lamback, as the nominated executor, propounded the following instrument for probate in solemn form, as the last will and testament of Frederick Lamback, deceased.

"STATE OF GEORGIA.—Richmond County.

" I, Frederick Lamback, of the State and county aforesaid, being weak in body, but of sound and disposing mind and memory, and anxious to arrange my worldly affairs while I have strength so to do, do make and publish this my last will and testament, hereby expressly revoking and annulling all others by me heretofore made.

"And first. I commit my soul to God who gave it, trusting for salvation through the merits of his Son and my Saviour, and I direct that my body be buried in a christian like manner and suitable to my circumstances while in life.

"Second. I desire all my just debts paid with as little delay as possible by my executor, hereinafter named.

"Third. I devise and bequeath to my wife, Elizabeth Lamback, the household furniture, portraits, etc., and a sum equal to her comfortable sustenance and support for and during her natural life, to be paid as hereinafter set forth. It is my wish that she should live with my son George F. Lamback.

"Fourth. To my daughter Elvira Gardner, wife of Henry N. Gardner, of Augusta, Georgia, I devise and bequeath an annuity of $600 00, to be paid in monthly payments of $50 00 each, during her natural life, to be paid as hereinafter provided.

"Fifth. To my daughter, Elizabeth Brown, wife of Angus Brown, of Barnwell county, South Carolina, I give and bequeath the sum of five dollars.

"Sixth. To my daughter, Clara Butler, wife of Osceola

Butler of Savannah, Georgia, I bequeath the sum of five dollars.

"Seventh. The whole of my real estate, I devise and bequeath to my son George Frederick Lamback, subject to the following conditions, to-wit: that from the rents and profits of said real estate he maintain and support his mother in a manner suitable to her circumstances in life, so long as she shall live, and from the same source to pay or cause to be paid to the said Elvira Gardner, the said annuity of $600 00, for and during her natural life, and upon the termination of said bequests chargeable upon said property, to take and hold the same absolutely.

"Eighth. I nominate and appoint George F. Lamback, as executor of this my last will and testament, hereby charging him with the faithful performance of all the conditions and provisions therein contained.

"In testimony whereof, I have hereunto set my hand and affixed my seal, this fifteenth day of August, eighteen hundred and seventy-one.      (Signed)

"FREDERICK LAMBACK. [L. S.]"

"Signed, sealed, declared and published by Frederick Lamback as his last will and testament, in the presence of us who subscribed our names hereto in his presence, and at his special instance and request, and in the presence of each other, this fifteenth day of August, eighteen hundred and seventy-one.

(Signed)      "WILLIAM B. YOUNG,
              "JAMES P. K. McLAUGHLIN,
              "WILLIAM HENRI CLAY."

Elvira F. Gardner, Elizabeth E. Brown and Clara V. Butler, daughters of the said Frederick Lamback, deceased, filed a caveat to the probate of said paper upon the following grounds, to-wit:

1st. Because it is not the will of Frederick Lamback, as at the time of the alleged execution of the paper, he was not of sound and disposing mind and memory.

2d. It is not the will of Frederick Lamback, because while

Gardner *et al. vs.* Lamback.

executing it he was under the influence of his son George F. Lamback, the propounder, and so did not execute it freely and of his own accord.

3d. It is not the will of Frederick Lamback, because he thereby undertook to dispose of property which he had 'by deed, dated February 4th, 1858, conveyed to Henry Gardner, in trust for the wife and children of him, said Frederick Lamback, the property consisting of the lot occupied as a residence, fronting ninety feet on Green Street, in the city of Augusta, between Jackson and Campbell Streets, and running through of the same width to Ellis Street, having been purchased by Frederick Lamback, January 14th, 1850, and June 15th, 1853.

The Court of Ordinary held said paper to be probated in solemn form as the last will and testament of Frederick Lamback, deceased, and ordered that letters testamentary be issued to George F. Lamback, the executor in said will named and appointed.

The case was carried, by appeal, to the Superior Court of Richmond county, and tried before that tribunal during the January term, 1872, when, substantially, the following evidence was introduced.

#### EVIDENCE FOR PROPOUNDER.

William H. Clay, sworn: That is the signature of witness to the will; was requested by George Lamback to go and witness Mr. F. Lamback's will; went into the house; Mr. Foster had will in his hand and asked Mr. Lamback if he knew what instrument he had just signed; Mr. Lamback replied that it was his will; witness thinks nothing else passed. Testator signed in presence of all the witnesses and we signed in the presence of each other; he seemed to be perfectly conscious; he remarked, "I am very much obliged to you, gentlemen;" he said this when witness told him good-bye; witness remained but a few moments. There was nothing, from that interview alone, to lead witness to believe testator was of sound mind; his impressions, from previous transactions, were

that he was insane.    Witness has been a tenant of testator for two years; for past six months, has transacted business with George Lamback; Mr. George Lamback never said anything to witness about his father's condition during transactions of his business; he said to witness, on two occasions, to be careful about letting his father have certain medicines; cannot state that he heard from George Lamback that his father had attempted to take his life; testator called on witness several times for poisonous medicines; witness deceived him, giving him quinine for morphine; this occurred about six times within three months before the execution of the will; he did not impress witness as a man of sound mind; James McLaughlin, Captain Young and propounder accompanied him to the house to witness the signature to the will; thinks propounder remained during the signing of the will; knew nothing of contents of will before signing.    Morphine is a deadly poison, especially when twenty-four papers are wanted at one time; is not a practitioner of medicine.    Testator said to witness, some two or three months before the execution of the will, that he had nothing to eat and no wood in his house.    Would think a man capable of making a contract capable of making a will; does not think a man who wanted twenty-four powders of morphine, and said he had taken it, was of sound mind; persons accustomed all their lives to morphine could take twenty-four powders without causing death; the effects of morphine and quinine are quite different.

James P. K. McLaughlin, sworn: That is the signature of witness attached to the will; the signature was appended in the parlor of testator's house, on Green street, in the city of Augusta; the attesting clause was read to the witnesses; the testator signed in the presence of the witnesses, and the witnesses in the presence of testator; the testator said the instrument was his will; he signed it before the witnesses; had no right to believe testator otherwise than sane; witness is an intimate personal friend of propounder; propounder came to get witness to attest the will; witness entered from the rear of testator's house; encountered Captain Young, Mr. Clay and

propounder; found testator sitting in his parlor; Mr. Foster was in the room with him; propounder did not remain in the room; at the time of signing, no one else was in the room besides the testator, the witnesses and Mr. Foster; testator knew us all; he shook hands with each of us as we entered, and asked us to take seats; when we were about leaving the room, testator remarked, "thank you, gentlemen!" On the day testator died, he sent for witness and asked him if he had slept any the previous night, witness having sat up with him; testator did not ask witness if he did not know he had not slept any for forty years; Mr. Brown was present. Testator was in his shirt sleeves the day he signed the will; propounder told witness, prior to the execution of the will, that he had heard that testator had attempted to take his life; that he had nailed up the windows to testator's house; propounder did not state the purpose for which he had nailed up the windows; witness thinks, but is not positive, that he heard propounder say, prior to the execution of the will, that testator had tried to kill himself with a pistol, and that he had told Mr. Bowen and other gunsmiths not to load any pistols for him; did not hear propounder say that he had to have testator watched in the streets; does not know that testator was incapacitated from attending to business for some time; does not think he so stated before the Court of Ordinary. Witness went in the rear way to testator's house because it was the nearest to his place of business; propounder was the only male person living with testator at the time of the execution of the will; he was the only son; testator always regarded propounder with especial favor; witness was very intimate in the family; has seen testator in his candy store once or twice; does not remember the last time; thought he was a sane man; did not see anything otherwise.

William B. Young, sworn: That is the signature of witness to the will; the will was signed by testator in the presence of the witnesses in one of the rooms of his house, the parlor he thinks; the witnesses saw testator sign, and signed themselves, in the presence of each other. Testator stated, in

substance, that he knew the instrument to be his will, knew its contents, and desired the witnesses to witness his signature. As one of the witnesses left the room the testator shook hands with him, talked to him, but witness did not hear what was said; saw no evidence of insanity; knows of testator having settled an account with witness as book-keeper of Mr. McCord; does not remember the date; it was after witness was employed with Mr. McCord, which was in October, 1869; it was six or seven months after witness was employed; at that time he did not seem otherwise than as a sane man; he settled the account by a note; has seen testator within a year and a half or two years before he signed the will; does not remember whether the will was read over to testator on the day of the execution; it is impossible for witness to say whether the remark that that was his will was entirely confined to a question propounded by Mr. Foster in reference to the will; witness had the impression that he said, in answer to a question, that he understood, that he knew what he was doing; whether this was in reply to a question by Mr. Foster, witness does not know; had no conversation with propounder in reference to testator's condition. Ten or fifteen days after testator's death witness opened the will; the will was produced by propounder; thinks propounder was in the room when testator signed, but am not certain.

H. Clay Foster, sworn: Witness drew the will at his office on August 15th, 1871; during that day propounder called to see him and stated that his father desired him to draw his will; went with him to the house and entered the parlor; had heard that testator was insane; went there intending to satisfy himself whether it was true, with the determination to refuse to draw the will if witness ascertained that he was not himself; witness means of sound and disposing mind; when testator came into the parlor witness talked with him for some time before the will was mentioned, to satisfy himself whether he was capable of making a will; he mentioned the subject of his will to witness and said he had sent for him to draw it; witness had some paper in his pocket and with a pencil took

Gardner *et al. vs.* Lamback.

down the terms, etc.; when testator got to the third item, in which he bequeathed to his wife the house furniture and pictures, he said in a general way that he wanted her to be supported by George for the rest of her natural life; witness asked him if he did not intend to leave his wife something else, telling him that she was entitled to dower in the realty? He replied, that is all right, she knows all this, we have talked it over, she desires it to be done in that way. Witness drew the will on that day; found that he had omitted to get the name of the executor or of his wife, so he left blanks for them; carried it to testator that evening at about half-past three o'clock; went by the shop and told propounder that he wished to see his father again, that he had drawn up the will. Witness read to testator the terms of the will; he said he wanted to give Mrs. Gardner $50 per month during her natural life; witness asked him if that was what he wished, because the condition would cease at her death; told him that Mrs. Gardner might die at any time, and asked him if he wished it to go to her children; he said "it is all right as it is, let their father take care of them." Witness filled in the name of Mrs. Lamback at testator's house, and with different ink and a different pen from what were used in drawing the will. When witness got to the fourth item, testator stopped him and said that was not the way he wanted it, as he wished it paid to her, Mrs. Gardner, every month; witness said, wait till he read further. Witness then read on where it made it payable monthly; testator then said that was all right; the will was then executed. When the will was executed, witness took it up and gave it to him, having previously inserted Mrs. Lamback's and George Lamback's names in different ink. Witness told propounder that he wanted three persons to witness the will; he asked witness if he wanted any particular persons; replied that he did not, so long as they were not interested in the will. Testator went to the door to call propounder; witness told him that he had sent him after witnesses; he said, "all right." When the witnesses came in, witness asked testator if he knew what the paper was; he replied, certainly, it was his will; witness asked

him if it was drawn in accordance with his wishes; he said it was. Witness asked him if he desired these gentlemen to witness it as his will; he said he did; witness then read the attestation clause to the witnesses and they signed it after testator had signed it; witness then folded the will up and handed it to the testator; he asked witness what he was to do with it; replied that it was usual to deposit it in the bank where a person kept his account; he handed it back, with the request that witness would keep it for him; witness sealed it up in his presence, signed his name across the envelope, put it in his (witness') iron safe, and it remained there until testator's death; when witness heard of his death, he told propounder that his father had made a will, and that he was executor, and that if he would call at witness' office or house, he would turn the will over to him. When testator first saw witness, when he called to get instructions as to the will, he shook hands with him and asked him if he was not the son of John Foster; he said he had known witness' father well—had known him many years. Witness saw the portrait of some person on the wall who did not look at all like testator, and asked him who it was; he replied, it was he; witness said, "it does not look like you;" he said, "no, it was taken long ago;" witness remembers figuring his age up with a pencil; he said it was taken in 1839, witness thinks; the time that he told witness tallied with his calculation. He said he was a German. He then mentioned what he had sent for witness for; witness took the terms; stayed an hour. Witness kept the will in his office until four or five days after testator's death, expecting propounder to come and get it. The subject of testator's will was never mentioned by witness to any one until propounder came to get it, but once, to Mr. Gardner, in Mr. Harper's office. The opinion of witness as to the sanity of testator is proven by his drawing the will; had he thought testator was not in a condition to make a will, he would not have drawn it; no one was in the room when the will was signed except the three attesting witnesses and witness; witness never before served testator in a professional capacity; propounder came and said

his father wished him to draw his will; witness is not interested in the result of this suit; his fee is not conditional; it will be paid, whatever may be the result.

The instrument propounded was admitted in evidence as pleading. Propounder closed.

EVIDENCE FOR CAVEATORS.

W. E. Dearing, sworn: Witness is a practicing physician. Has known testator for thirty years, and has been his family physician, except for a short interval, from twenty-two to twenty-five years; has been called in frequently the last two or three years; was as intimate with testator as any one in Augusta; first noticed a change in the mental condition of testator in the latter part of 1865; his condition improved for a time, but afterwards grew worse; his mind became permanently affected in the latter part of 1870, and first of 1871; he was under the impression that he was poverty stricken, worth nothing and unable to support his family; these views were extreme; he complained that he had no means of livelihood, or to buy even necessary medicines, or to procure food for himself or family; testator was a man of large means; in July last he said he had not slept for fifty years; sometimes, he said, for twenty years; witness was informed, that he did not sleep; a man who did not sleep for that time would die; he was under the impression that he could not eat or drink, and that a portion of his body was gone; no part was gone that witness was able to detect; testator was determined to starve himself to death, and he succeeded in so doing; witness believes this to have been the cause of his death, and his family so think; he died on the 9th day of November, 1871; witness called to see testator on August, the 13th last, also saw him on August the 15th; Mrs. Lamback was at that time very low indeed, and testator was frightened about her condition; witness does not consider himself competent as an expert, further than the law makes physicians experts; does not think that he was competent to attend to any business at that time, which requires a sound

mind; does not think he could have had a rational desire as
to the disposition of his property; when witness called, Mrs.
Lamback was hysterical, feared she would not live through
the day, so told the family; does not know any time when
testator was free from these delusions for six or eight months;
any intelligent man who should converse with him on mat-
ters not connected with his particular delusions would be likely
to suppose he was all right;. insane persons frequently con-
verse rationally on subjects not connected with their delusions;
a person in an ordinary conversation with testator, not an ex-
pert, could not have formed a correct opinion of his condition,
without touching on the subjects on which he was insane, or
about which he was deluded; there is no arbitrary standard of
sanity or of insanity, except by comparing him, or his action
and conduct and habits, after we recognize the fact that he is
insane, with himself at some previous time when he was, un-
questionably, a sane man; it is very easy for a person insane
to deceive a sane person; lunatics have been known to cause
their keepers to be imprisoned as insane, on their representa-
tions.    When testator was sane, he was a neat man; in his
last illness, all solicitations to allow himself to be cleaned,
failed to persuade him to take a bath; he took no care of his
personal cleanliness, nor of anything around him; he would
not even allow pieces of burnt paper, from which he had lit
his pipe, on his table to be removed, but insisted on their re-
maining until they had accumulated in large quantities; when
witness asked him to pay his bill, he said he did not have the
means; that he was unable to buy medicines; the fact that
testator might remember when his rents became due, or might
notice any change in his house arrangements, would not be
evidence that he was free from the delusions under which he
suffered; his habits of exactness might remain; a lucid inter-
val, as understood by physicians, is when a mind is perfectly
clear upon all subjects, and when the mind of an insane per-
son is free from the delusions under which he labored; to en-
joy a lucid interval, the insane mind must return to its sane
habits; it would require an expert to test this fact, and even

Gardner *et al. vs.* Lamback.

he would often fail; the propounder told witness that he had to notify several gunsmiths not to furnish his father loaded pistols; a negro man, named Sam, was always sent to follow testator when he went into the street; propounder told witness that he was afraid his father would go to the river and drown himself, and that was why he was followed. On the 15th of August, he had some delusions; said he had not slept; wanted to talk with witness about his not sleeping; said he could not eat; that he tried to eat, but failed; that he was not able to buy food; saw him two or three times on the 15th of August, when visiting Mrs. Lamback; saw Mrs. Fargo, the mother-in-law of propounder, and, perhaps, other persons. Witness testified before the Court of Ordinary that he was not an expert in mental diseases; said then, and is now of the opinion, that testator's disease was a monomania about property; a man may be insane upon one subject, and sane upon all others; remembers calling testator's attention, during his last illness, to something funny about roasted oysters, in the presence of the family; witness recalled something that had happened years before; his memory was perfect upon that point; testator had a very firm will; that he starved himself to death is evidence of that fact; never expressed the opinion that nothing was the matter with testator's mind; witness expressed the opinion that Mrs. Lamback's condition was the worst of the two; thought testator would outlive Mrs. Lamback; did not say to Mrs. Lamback, or to Mrs. Fargo, that nothing was the matter with testator's mind during his last illness; there must have been some mistake: either witness misunderstood their question, or they his answer. Testator paid witness some bills in 1866; nothing since, except $5 00 or $10 00; does not know how he was then; was not visiting him professionally; does not think he could have been all right; in May, 1871, or in the spring or summer of that year, witness would look on all transactions with exceeding doubt; was present when he died; not at the actual moment; he was somewhat conscious; he recognized his family and those around him; he recognized witness the last visit he paid him; insane persons frequently become ex-

traordinarily acute at such a time; one instance was Mr. John Low; he had been in a low delirium for years; Dr. Ford attended him; witness was present when he died: witness being the only Mason in the room, he sent all other persons out and gave him directions about Masonic attendance, etc., at his funeral; then he made his will, and after his business matters were arranged he called his family and bade them good-bye, then he lapsed into insanity and died in that condition.

George McWhorter, sworn: Went up to testator's to get some information about a case of Mr. Brown's, testatator's son-in-law; witness was hurried by a servant into testator's room; this was about the middle of May, 1871; testator met him at the door of the room; witness discovered at once that there was something wrong about him, and consequently said nothing about the case; witness said, "how are you?" He shook his head and said he was not well at all, running his hand through his hair; he said he had not slept for a great length of time, three or four weeks or months, witness forgets which, but it was for so long a time that it was impossible to be true; asked him to lie down on his bed; he said he could not lie down nor sit down; while talking, he walked backwards and forwards; he never asked witness to take a seat; he had on nothing but his shirt, pants and socks; he had a very uneasy, anxious manner about him, as if apprehensive of something; his eye was wild looking; when witness left, testator did not follow him; saw he was a crazy man; saw no one about the house except the servants; went to the door of the steps that lead down into the basement and called several times; while there calling, he would come to his door, look out at witness and then pull his head in; he did this several times; not being able to make any one hear, witness went down the steps into the basement and there found a negro servant; never saw him after that; on that day he was not capable of having a decided and rational desire as to the disposition of his property; he was a crazy man; has known testator since witness was a boy; has known him for many years. That is witness' acknowledgment of service in the case of

Gardner *et al. vs.* Lamback.

Beall, Spears & Company *vs.* Frederick Lamback; the acknowledgment is dated May 12th, 1871; that is about the time witness testifies to; went from testator's to Mr. Miller's office; told Mr. Miller about this; went to see testator about a debt contracted by Mr. Brown, in which testator was guarantor or security; the debt was contracted, witness thinks, some time during the previous winter, for plantation supplies.

E. V. Sharp, sworn: Testator married witness' sister; has known testator for thirty-nine years; there was a decided change in testator's condition; cannot state the time when it took place; testator was a very liberal man; he became to be very stingy; he was a very cleanly man; has seen him since in a very pitiable condition; has often seen him in his drawers, unbuttoned or torn so that a person could see anything they wished to; has seen his toes out of his socks: they were grimey and black; his finger nails were long and black; the room where he smoked was a perfect sight; pieces of burnt paper lay all over the table, presenting a dirty appearance, and he would refuse to have them removed; he imagined that he was very poor, and that his physical condition, by reason of his rheumatism, was very bad; if it had been as bad as he said, he could not have escaped death; about the middle of last summer, he said he had not slept for weeks, and sometimes he would say for months; the last few nights of his life, he said he had not slept for forty years; he said that he had no blood in his body; had no feeling; could not eat; that he was so poor he could not buy food for himself and family; last June, July and August, he could not have had a decided and rational desire as to the disposition of his property; he was incompetent to attend to any business; has seen him eat and sleep several times; has tried to reason him out of the impression as to his extreme poverty, but failed; also, out of the impression that he did not sleep, but failed; his treatment of the different members of his family was uniformly kind and affectionate; did not discover that he showed any greater affection for one than for the other; lived in his house once before the war, but since the war has not been so well acquainted as before; up

to the war thought his favorite was Mrs. Brown; her sisters used to taunt her with it and say if they wanted anything— "Sissy, you ask father, he will do anything for you." Last year, as witness was going out of the testator's back gate, he came out and said he could not sleep; he said Buddy (propounder) cursed and abused him; this was in 1871, before the 4th of July; has often noticed disrespectful conduct on the part of propounder to testator; in conversation propounder would swear, he did not strike testator, it was altogether in reference to his language; when Mrs. Brown kept house for testator their demeanor toward each other was very affectionate; propounder is the youngest child and only son; Mrs. Butler comes next, then Mrs. Brown, and then Mrs. Gardner; Mrs. Brown was married twice; have heard that testator paid some debts for her first husband; testator was a very obstinate and determined man, but if one approached him in the right manner he could be induced to do a great deal, means when he was sane; his insanity commenced about the close of the war, but afterwards he got over it; witness made up his mind, about the spring of 1871, that testator was crazy again; between the spring of 1871 and the execution of the will, whenever witness saw him he was always the same; just before testator became confined to the house witness did not remark in the presence of Mr. Tanner and his wife that his delusions "were nothing but obstinacy;" Mrs. Couterier asked witness whether it was an unusual attack, he remarked hastily as he went out of the door, that "it was filth and obstinacy;" Mrs. Gardner has four children living; cannot say how long the family lived with testator, they lived with him a long time; has heard testator say that he had bought a place in Appling county and that Mr. Gardner was to live on it; does not know who owned the place.

Elvira Gardner, sworn: Witness has known testator ever since she can recollect, he was her father; he died in the city of Augusta, on November 9th, 1871; did not see him execute a will but believed he had done so; a few days after testator's death propounder told witness that there was a will; since

Gardner *et al. vs.* Lamback.

then has seen the paper herself; the will was signed about August 15th, 1871; at that time testator's mind was very unsound, and continued to grow worse until his death; testator would sit over the fire moaning, groaning and bewailing his poverty; had no conversation with him about the disposition of his property; does not know that testator was under the undue influence of any one, but believes he was under the influence of his wife and propounder; propounder was always a favorite with his mother, and she wished him to have all the property; testator's mind, in the opinion of witness, was so weak as to render him incompetent to make a will; noticed a weakness in his mind soon after the war ended; on the day the will was read at the family residence in the presence of witness and her husband, witness did say without reflection that she was satisfied with the will, and her husband said that he was satisfied if witness was, that he had nothing to do with it; cannot say that propounder did exercise an undue influence over testator; does not believe the paper was freely executed because witness does not think testator would have made such an unjust will; has been married sixteen years; up to 1870 spent nearly the whole sixteen years with testator, her husband being absent one year in addition to the four years of the war; prior to the war witness' husband farmed in Appling county; was also for a short time in the employ of the Express Company; since the war he has been in business with testator; does not know what salary or compensation he got; thinks testator indorsed a note for the husband of witness, at her request, in May, 1871; witness is one of the caveators; the first indication of testator's insanity witness noticed just after the war; previous to this change he was agreeable and cheerful, he was also particular in his dress, changed his linen two or three times a day; he gradually grew low spirited, very desponding and careless in his dress, until he became indecent; he refused to change his clothes or to have them taken off; vermin were on him; told her that he was starving; that he had nothing to eat, and not a cent on earth; that he did not know what to do; that he had not

slept in fifty years; that he would not live in that way; that he intended to put an end to his life. About six months before his death he said one side of him was dead, and about three months before his death said his heart did not beat; that he had no pulse; that he did not breathe; he took but very little nourishment; a cup of tea now and then was all. In January, 1870, testator came into witness' room at his residence, where she had resided eight or nine years, and told her in a very distressing manner that she must rent a house and move away; that his wife and propounder would give him no rest; that they worried him a great deal, and he could not stand it; he said he told propounder that witness was his sister, and the house was large enough, and he hated to tell witness to leave; he said propounder would not listen to him; in February witness moved away; testator cried bitterly on parting with witness, and told her not to blame him; that it was his wife's and propounder's fault; he came to see witness very often, and would always bring a basket of porter, ale, etc.; in October, witness moved into the city; then he came every day to see her; through the summer he would often come six times a day; would sometimes dine with her, and tell her that there was nothing to eat at home; that they were all starving; was spending the day last summer with him when he left the house without the knowledge of any one; he was brought back by a drayman on his dray; the drayman said he heard a noise in the direction of the canal, went there and found testator in the canal, that he had a hard time getting him out; never heard of his being nor saw him on the streets after that; he came to witness' house and took from her room her son's gun; the windows in testator's room were nailed down; he would be on the way to visit witness, and when he did not know that a servant was watching him, he would cross the street in the direction of the river, and witness' attention would be called to him by hearing the negroes on the streets say, in loud tones, " Yonder goes Mr. Lamback to the river to drown himself." Last January propounder was married; testator took no interest

in the matter at all, did not see him married; previous to his marriage testator came to witness and told her propounder had been cursing him because he had no money to give him, and he was very much hurt at propounder's treatment; has never heard of nor seen testator eating a meal at the table since propounder's marriage; has heard propounder curse testator at the table when he told him not to make so much noise, and has heard him use such expressions as testator did not like to hear; testator was affectionate to all of his children; on one occasion saw him hold witness' sister Lizzie's hand and would not release it, not even for her mother's; he would often cry when she would bid him good-bye. From 28th of August to the latter part of September did not see testator; when witness again visited him, found him more emaciated and low spirited than ever; on August 15th spent the day with her mother, who was very ill; while sitting at her bedside, heard some one walking in the passage; went to the door and saw Mr. James McLaughlin, and a gentleman that she did not recognize, walk into the parlor; in a few moments propounder came to the door and called testator; he walked off with propounder; he was then in his shirt sleeves and without shoes; a short time after left her mother's room and was walking in the passage when a gentleman came to the parlor door and told witness to tell propounder to step there a few moments; propounder went to him. A short time after testator's will was read heard her sister Lizzie say, "We all know father was crazy when he made that will;" propounder said "you would not have thought so if he had left you all;" she said to him, "No, I would still say he was crazy;" she said "she would not have the $5 00;" propounder told her "She would have to take it;" she said "She would not;" propounder said testator was obliged to give it to her to make the will good, that he had given to him all and he would be damned if any of them should have it. Testator purchased a place in Appling county; told witness he bought it for her; when the war broke out, her husband having to leave for the army she became dissatisfied and moved to tes-

tator's house in Augusta; the place was bought in 1859; testator sold it because witness did not like it.

Angus P. Brown, sworn: Witness is testator's son-in-law; has known testator about twenty years; first noticed that his mind was affected in 1865; he was exceedingly low spirited; he partially revived from this depressed condition, but his mind became permanently affected in the last of 1870 or first of 1871; he complained of his poverty and want of sleep; he said he was very poor, wanted the necessaries of life, and could not buy medicines; he was perfectly able to buy any necessaries he might need, and much more; his estate consisted of his residence on Green street, Clara Hall on Broad street, house on Green street, a house and lot on the river bank, and a little lot in the rear of Mr. Ramsey's store; he complained that he had not slept, but witness has seen him sleep; he said, on various occasions, that his heart did not beat; that he had no pulse; when sane, he was very cleanly, putting on one or two shirts a day; after his mind became affected, he was extremely filthy; he was treated by his family, the latter part of his life, as insane; a negro, named Sam, was kept watching him while the family were at their meals; a negro man was kept watching the steps to prevent him from making his escape; propounder said the windows were nailed down to prevent testator from escaping; propounder feared that he would go to the river and drown himself; witness was present when propounder ran out from an office in the basement and got a pistol which testator had concealed; he brought it down and fired it off into the floor, in the presence of testator, who had come in; he broke the pistol and threw it into the fire-place and said, "Damn you, you won't kill yourself now." Saw testator once take a pistol from behind the looking glass and try to conceal it in the bed; testator told me once to look in his desk; there was a pistol there which would not fire off; that he had tried to kill himself, but it would not go off; asked me to look and see if it was properly loaded; that was some time in the summer of 1871; witness was not in the house when the will was made; arrived in the city about

twelve o'clock at night, on the 15th of August last; as soon as witness saw him that night, he commenced talking about his peculiar condition; he talked all night; said he could not sleep; went on about his poverty, etc. Propounder did not treat testator with the respect due to a father; when testator would commence talking at the table, propounder would rattle the knives and forks and say, "Shut up," etc.; testator would say, "Don't do so, George," and propounder would get mad; propounder would frequently say, "Damn it, if you don't like it, leave," etc. Propounder would say sometimes that testator was insane, and then, again, he would say it was nothing but contrariness; heard propounder say that testator had been brought home on a dray; that he had been in the canal. Propounder first told him, a few days after his father's death, that testator had made a will; there was no difference in testator's treatment of his several children; considered testator perfectly insane from January 11th, 1871, to the day of his death; thought that, just before he died, he became partially sane; saw testator on the 23d or 25th of May, 1871; testator paid off a part of a claim for witness as security; testator gave witness, four or five years ago, three mules, for which he paid $550 00, and $25 00 worth of plows; Mr. Archer was owing testator a claim contracted before the war, and these mules were given in settlement of a part of it; testator indorsed for Mr. Gardner after January, 1871; witness married into testator's family in May, 1864; thinks Mr. Gardner and his family were then living with testator; they came during the war and remained there until two or three years ago.

Caroline V. Sharp, sworn: Witness has known testator since 1854; witness' husband is a brother of Mrs. Lamback; lived in testator's house about one year—from the latter part of 1854 to the latter part of 1855—and has since visited there frequently; for several months before his death, considered him both physically and mentally affected; her reasons for believing him insane are, that she knew him to be possessed of means, yet, in his imagination, he was poor; first noticed his insanity about two years before his death; he grew continually

worse; on several occasions, he came to witness' house in the heat of the day, remaining only a few minutes, and remarking that he had not slept for six months; the last week of his life he said he had not slept for twenty years, and for fifty years; that he had no blood in him, that he did not breathe; saw him in August, 1871, in his usual pitiable condition; afterwards, he grew worse; he was, when sane, regular in his habits at home, and strictly neat in his apparel; after his mind became affected, he had a total disregard for his personal cleanliness; his treatment to his family was kind, without any show; his daughters evinced a due portion of kindness and affection for him; his son was harsh, disrespectful, and seemed wanting in affection; at times, testator's insanity would evince itself more plainly than at others, but during the period about which witness has testified, she did not consider him in his right mind; witness once kindly reproved propounder for using disrespectful language to his father; he replied, " Well, aunt Carrie, it is the only way to get along with him ;" never remarked that testator was more devoted to George than his other children.

A deed from Frederick Lamback to Henry Gardner, dated February 4th, 1858, conveying in trust to him property on Green street, between Jackson and Campbell, and also six negroes, was introduced.

Osceola Butler, sworn: Witness first saw the above deed in the latter part of February or first of March, 1871, in the possession of propounder; he read it, showed it to witness and said it was the will of his father; witness first heard of the present will the day after testator was buried, from propounder; propounder asked witness if he knew testator had made a will? Witness asked him, " when?" He said, " last August;" asked him who made the will; he said, " Clay Foster;" asked him why he got Mr. Foster; he said he had been to Aleck Phillips, who disappointed him, then he went into the street, and the first person he met was Clay Foster; he said he did not know anything about the contents of the will, that Clay Foster had it; witness said that it was very strange that the old man should make a will; he replied that he had

witnesses to it; this conversation occurred on Saturday, the will was read on the next Wednesday or Thursday; came to Augusta the last of February or first of March, 1871, to see about the deed or will as propounder supposed it to be; propounder asked him to see testator about fixing up the store under Clara Hall that was occupied by Wells & Clay, as they had threatened to leave it if the repairs were not made; saw testator, but found him incapable of attending to business; propounder and witness went to Wells & Clay, and advised with them about what to do; told them that witness thought testator was unfit to transact any business; returning the conversation happened about what propounder supposed was a will; propounder obtained this paper from an iron safe in testator's room; witness sold the land in Appling county for $500 00; testator received the proceeds, all but $100 00; propounder told witness that testator was not present at his wedding; heard propounder use some disrespectful language to testator at his house, about some wood-land, in which he told testator that he could take his damned land; they said so much that witness became disgusted and paid very little attention. Witness is the husband of Mrs. Clara Butler, one of the *caveators;* testator recognized all of his family who were present when he died; propounder was not present; does not know that he spoke to propounder the last thing he said; did not hear him tell propounder that he must take care of his mother; the $100 00 of the proceeds of the Appling county land, which testator did not receive, he told witness to give to his wife as a Christmas present; on the 6th of November, 1871, when at testator's house witness had been drinking, but was not under the influence of liquor; at the reading of the will propounder claimed all the property as his own, including the house and premises by the deed conveyed.

Matthew F. Nelson, sworn: Witness went to testator's house in the evening about eight o'clock, before his death, and watched with him all that night until he died; he was in an exceedingly filthy condition; he had on his pants, shirt, drawers and socks; they had not been changed for some time.

C. B. McAllister, sworn: Witness washed testator's body after he was dead; he was very unclean and dirty—covered with vermin; never noticed testator until his death.

W. D. Bowen, sworn: Propounder told witness that testator was out of his head—threatened to kill himself; asked witness not to sell him a pistol; went back to his store and told his men not to load any pistols for testator; that if they had to load one, not to put any powder in it, but only balls; in the early part of 1871 propounder told witness that testator was deranged; sometimes would see him on the river bank; walked a little way with him once; spoke to him and said: "how do you do;" he shook his head and would not open his mouth at all; walked on further with him; he spoke of his pecuniary condition; said he had lost a great deal of money, had nothing in the world except enough to bury him; considered him insane; has known testator for a very long time; he was generally reserved and quiet; he was more so than usual when witness met him; met him twice; walked around with him; he looked different from what he did many years before.

E. Gallaher, sworn: Witness has known testator from the year 1837 to the day of his death; considered him a very cleanly man and his conduct was that of a gentleman; called on him in July or August, 1871, to pay him a visit of respect; called to build up his spirits and to hold out the idea of long life; he said he must die, that his physician said he could not recover; saw nothing wrong as to cleanliness; he was dressed as an invalid in his pants and shirts.

E. G. Pritchard, sworn: In 1870, in the month of April, May or June, testator came to witness to give in his tax returns; they were so small that witness concluded to turn them over to Mr. Sheron, the receiver; witness was acting as his clerk; testator said his property consisted of two small houses on the river bank.

Elizabeth Brown, sworn: Witness is a daughter of testator, who died on November 9th, last; he was confined to his house about four months prior to his death; was told by propounder

that testator's will would be read in the presence of the family; said to propounder after it was read, "brother, you know and we all know that father was crazy when he made that will." Propounder said that the reason why testator left sister Clara and witness five dollars, was to make the will good; propounder said he would be damned if they should have a cent more; told witness that she would have to take the five dollars; witness said she would not take it; in the spring and summer of 1871, testator's mind was very unsound; in 1865 he spent some time with witness in the country; noticed that he was gloomy and very depressed; said he could not sleep and had not slept for some time; he partially recovered and then grew worse, and for six months before the execution of the will, witness considered him perfectly insane; he would say he could not breathe, he had no pulse, his heart had ceased to beat, one side of him was entirely gone, he and all his family were starving; his insanity displayed itself by attempts to shoot and drown himself, and also, by wanting to take poison to destroy himself; about the latter part of January or February, 1870, witness was called on to keep house for testator while her mother visited her sister Clara in Savannah; kept house for him about three months; his mind was unsound at that time; propounder's treatment to testator was at all times unkind and disrespectful; he would ask testator for money and when he would tell him to wait, that he did not have it, propounder would reply that it was a damned lie; about February 22d, 1870, propounder came home intoxicated and used very abusive language to testator; testator became very indignant and left the room without speaking a word; heard propounder say often that testator was crazy; on the night of August 15th last saw testator in his bed-room; he called me to his bedside and said: "Sissy, I can't sleep; I have not slept for fifty years; I am starving and all the family are starving." Saw him on the 16th of August, and his conversation was about the same; testator was very kind and affectionate to all of his children; propounder showed her a pistol that he had taken from testator because he had tried to shoot himself; he

also told her that he had nailed down the windows of testator's room to keep him from escaping to drown himself; once saw propounder and testator in a scuffle, propounder endeavoring to wrench a pistol from testator's hands; propounder told her that he had locked the front door and the sitting room door to prevent testator from escaping; that he sent a servant to watch testator to keep him from going to the river to drown himself; that testator had been brought home on a dray from the canal, where he had attempted to drown himself; testator's mind was unsound since 1865; he never was in his right mind, nor had lucid intervals during that period; he was sometimes better, but, upon the whole, grew worse; very often when witness was keeping house for testator when he would request propounder to attend to some business for him, propounder would curse him and say: "by God, I have something else to do;" propounder would rattle the knives and forks on the table, testator would tell him not to do so, when propounder would reply: "Damn it, if you are tired of it, leave!" Was not present in the room when testator died, but was in the house; he recognized the family the afternoon before he died; he said to witness: "Sissy, don't cry;" and not "Buddy don't cry, we must all do it." He did say to propounder: "Buddy, take care of your mother." Does not know that testator ever gave witness' present husband any money; he did give him three mules and about $25 00 worth of plows and gear; testator endorsed or stood security once for her husband to Baker & Rowland; her husband paid the debt.

C. T. Shaup, sworn: Has known testator all his life; testator when sane always conversed with witness whenever he met him; his manner changed, when he met witness last spring he did not know him; followed him one Sunday as he was going to the river, when he saw witness he turned back; his father and witness' grandmother were brother and sister; the family did not recognize witness as a kinsman, but testator did; he brought witness up to call him "uncle;" attended funeral as a member of the fire department and not of the

family; when witness saw him walking he was frequently accompanied by Mr. Gardner's youngest son.

Testator's bank account with the Augusta Savings Bank was introduced, showing a balance on December 28th, 1870, of $372 46.

. Angus P. Brown, recalled: Testator's last words were: "Sissy, dont cry, Buddy will take of your mother;" said to propounder that it was very singular that testator had no operations; he replied that testator had them in his clothes; this occurred in the summer of 1871; in the same summer he refused, upon one occasion to have his clothes taken off, but witness made a servant take them off; assisted in washing him and in combing his head; found many vermin in his head; had to force him; the pecuniary condition of testator's daughters is very limited.

Caveators closed.

### REBUTTING TESTIMONY FOR PROPOUNDER.

Belle Lamback, sworn: Witness is the daughter-in-law of testator; was with testator for nine or ten months, nearly every day; testator had peculiar ways; it was necessary to know him some time, in order to know him well; during the time witness knew him, saw nothing that would cause her to believe him unsound in mind; her reasons are that testator always knew when his rents were due; noticed the changes whenever made in the house servants, and knew their names; he conversed rationally upon all business matters; would recognize friends that he had not seen for months, and call their names; during the time that witness was a member of testator's family, kept house for him one month; had occasion to see him often during that time and conversed with him on business matters; would give him his medicines; a watch was on the mantel-piece, and when the time came round for him to take his medicines, he would call her, after looking at the watch, and state that it was the time to take his medicine; during this time he was ill, and often expressed himself as anxious for his recovery; saw testator on August 15th, last;

he was more composed on that day than he had been for some time before; he walked about the room more than usual, and asked witness several questions; propounder was always kind to testator and testator affectionate towards him; he always wanted propounder to be with him; would frequently send for him when he felt worse; when propounder and witness were first married, propounder wished to take a situation away from home, but testator objected, and said he wanted him to remain at home; testator was a man of very few words; he would never communicate his business to others; he was not liable to be imposed upon; propounder and witness wished him to change physicians, but he would not do so; Mrs. Butler, one of the caveators, said repeatedly that she did not believe there was anything the matter with testator's mind; heard Mrs. Brown say that she wished testator would divide his property before he died; she said this a day or two after the will was executed, but does not think she knew anything about the execution of the will at the time of the remark; Mr. Butler was intoxicated at the deathbed of testator; his wife said to him that it was a shame that he should come home in such a predicament to the deathbed of his father-in-law; testator's memory was very good; he recognized friends and acquaintances up to the time of his death; when he was dying he recognized all the children and spoke to propounder and to Mrs. Lamback; told propounder not to grieve for him, and added that propounder would take care of his mother; the last audible words he uttered were addressed to propounder and to his mother; in July, 1871, when propounder was engaged in manufacturing candy, he was at a loss to know to what extent to cook certain materials, he sent for testator who came and gave him all the necessary instructions; in the spring of 1871 testator came into the room where witness was sitting, and said he had been to see a man up town whom he pitied, as he was worse than sick, the poor fellow having ten children, all girls; has known testator ever since the close of the war; had frequent conversations with him at his house, both before and after her marriage, which occurred on January 11th, 1871;

Gardner *et al. vs.* Lamback.

propounder never mentioned to witness anything about testator's mental condition; testator was not at witness' marriage ceremony on account of his suffering from a carbuncle; he received witness in his bed-room; does not recollect whether he congratulated witness or not; he shook hands with her; never stated to the family or any one that testator was not right in mind or words to that effect; never expressed any fears about remaining upstairs alone with him; never discovered him attempting to escape out of any of the front room windows; propounder did nail up the windows of testator's room, and assigned as a reason that testator had been attempting to drown himself; knows nothing about testator being brought home on a dray; never knew of his attempting to take his life; don't recollect whether propounder ever told her that he had done so; he may have told witness so, but on account of the excitement in the family growing out of the reported attempt to take his life, she has forgotten it; on the 15th of August last, saw testator several times, but do not remember to have had any conversation with him; four gentlemen came to see him on that day; gave him his medicine as usual; had a conversation with Dr. Dearing on the 15th or 16th of last August as to the soundness or unsoundness of testator's mind; he said that there was nothing the matter with testator's mind, and that Mrs. Lamback was in a worse condition mentally than testator; propounder's demeanor to his father was the very kindest; testator showed greater affection for propounder than for any of his other children; he was always anxious about propounder and made frequent inquiries about him; he always wanted George with him; testator felt concerned about the recovery of his wife, but was not under her influence; he was not under the influence of any one; a few days after the execution of the will Mrs. Brown told witness that Dr. Dearing said testator's mind was unsound; witness replied that the Dr. told her he did not think his mind unsound; is certain that she never said testator's disease was obstinacy or filth, or words to that effect; have heard testator speak several times of his inability to sleep; don't remember how long he

said 'it had been since he slept; on two occasions in August last testator went to church with us; he spent his time smoking, reading the papers and lying down; a servant did watch and follow him when he left the house; a servant was required to do so; on one night testator attempted to go out and a servant was required to stay at the back door to prevent his egress; for one week a servant was required to keep watch over him while the family were at supper, because it had been reported that he had attempted to take his life.

Mrs. Gordon Fargo, sworn: Witness has known testator since witness was a girl, about thirty years ; saw him almost every day from the date of witness' daughter's marriage to his son to the day of his death, but never had any conversation of any length with him; witness' opinion was that his mind was sound; her reason was because whenever she addressed him he always responded in a rational manner; beyond the usual salutations witness rarely spoke to him for fear of his repulsing her in an abrupt manner ; desired to converse with him upon the subject of religion but feared his repulsing her; saw him frequently on the 15th of August last moving about the house and expressing concern about the health of his wife; his mind on that day was in as healthy a state as at any time during their acquaintance; the relations between testator and propounder were affectionate ; whenever testator felt worse he would call for propounder and say " Buddy, can't you do something for me;" the conduct of propounder to his father was as kind and devoted as that of any son could be to his father; don't think any one could ever influence testator ; when he said " yes " or " no," he came as near meaning it as any one witness ever saw ; this firmness characterized him to his death ; when on his deathbed they would want to change his position against his wishes ; he would become indignant and resist every effort to move him ; heard Mr. and Mrs. Butler and Mrs. Gardner say that there was nothing the matter with testator's mind ; Mr. Butler when summoned to the bedside of testator was intoxicated ; testator recognized all his family and friends when he was

Gardner *et al. vs.* Lamback.

dying; his memory was good; when testator was dying he spoke to his wife and said, "Lizzie, I am dying, and when I am dead you will miss me;" he called propounder a great many times and said, "Buddy, don't grieve for me, we have all got to die, take care of your mother." These were his last words; before 1860 testator dressed as neatly as any man; he was attentive to his business matters and a man of integrity; he was not affable in conversation, being a man of but few words; in 1870 and 1871 he was just the same in these particulars; does not know of what disease testator died; his constant complaint was of rheumatism in his knees; about the 15th or 16th of August last Dr. Dearing said to her that in his opinion testator's mind was sound; witness concurred in this opinion.

Rev. Dr. Dixon, sworn; witness is a minister of the Gospel and pastor of the first Baptist Church; in July, 1871, as witness came out of the pulpit on one Sunday a notice was handed to him by the sexton from Mrs. Gardner asking him to call on testator; Mrs. Gardner said she was anxious about testator's spiritual condition and wished witness to converse with him; witness remained with him about an hour; conversed at first about his bodily condition and then about his spiritual condition; testator spoke very affectionately about Dr. Cuthbert, the previous incumbent of witness' pulpit; said he had sat under his ministry; the interview was perfectly satisfactory; should never have suspected anything unsound about his mind; would never have thought of it; called again and was refused admittance; no reason given; the second call was about one week after the first.

Michael O'Dowd, sworn: Witness has known testator about nineteen years; had dealings with him up to a short time before his death, four or five months, perhaps; he first came to witness to purchase sugars to make different grades of candies, and afterwards he purchased his house groceries, etc.; he bought the goods and told witness that propounder would settle the bills monthly; saw nothing wrong about him; did

not call at his house after he was taken sick; propounder attended to the candy manufacturing business.

Theodore C. Bridges, sworn: At the time of propounder's birth, testator gave a convivial party at LaFayette Hall; he made the observation to a party of gentlemen that he had now a son born to him and that he was going to do wonders by him; the party was in honor of the birth of propounder.

S. C. White, sworn: Has known testator for eighteen years; he and witness were on terms of personal intimacy; saw him up to the month of August last very often going to and coming from his daughter's; said to him once, "you are so feeble, why don't you take the cars?" he replied, "it does me good;" never mistrusted anything in reference to the soundness or unsoundness of his mind; called on him to offer witness' services when he was sick; he was lying on his side; was not disposed to talk much; said he did not require witness' services; Mr. Gardner first told witness of his insanity after death of testator; never mistrusted anything of the kind; never heard any such intimations before; saw testator at the shop with propounder and his wife during the past summer.

E. J. Hickey, sworn: Witness was sent for to shave testator; the first time was on the 3d of August last; went generally then once a week up to October 12th; his conversation was general; said his hands were cold; said he could not sleep; when he was through being shaved he would rub his hands over his face and say he wished he felt all over as his face; he was not a man who conversed much; he was always perfectly rational to witness; never saw any vermin on his person; his condition was only such as might be expected from a man confined to the house; did not visit testator from August 25th to October 12th, 1871; the dates witness has down are August 3d, 12th, 16th and 25th.

Adolph Brandt, sworn: Has known testator well for fifteen years; saw him frequently in 1871, the last time in the early part of July, 1871; had a general conversation with him for five or ten minutes in his shop in regard to his health, etc.; from that conversation witness would say he was as sane

Gardner *et al. vs.* Lamback.

as he himself is; has never seen him since; witness is a particular friend of propounder's.

John Everett, sworn: Witness has known testator for twenty-three years; testator and witness married sisters; witness married Mrs. Sharp; has been very intimate in the family for twenty-two years; was married in March, 1850, at testator's house; during the years 1870 and 1871 has seen testator from twice to three times a month; in 1870 or 1871 testator requested witness to go down to Mr. Sharp's house and ask him why he had not called to take him to the canal as he had promised, and to tell him to come the next day; when propounder was married witness called at the house to see the different members of the family; saw testator; said he was sick; witness understood with a carbuncle or something of that kind; said to witness: "John, you have always known since you have known me that I have always expected to make this a great occasion, but I am not even able to see him married." About ten or twelve years ago, when testator moved from LaFayette Hall to his new store, he took witness up into a room and showed him boxes of what he said was wine; they were closed up; some were labeled back to 1835 on the boxes; he told witness that when propounder was born he had set apart all these, part of them to be drank when propounder was twenty-one, and part when he married, if he lived; witness' opinion is that testator's mind was affected on some subjects, on others he was as sane as anybody; during testator's illness he appeared particularly prejudiced against Mr. Gardner, so that Mr. Gardner's presence seemed to irritate him; it showed strong even in death; once testator asked Mr. Gardner what he was staying there for, why was he not about his business? told him to leave the room; Mr. Gardner said he would go; a half hour or an hour afterwards testator observing him in the room, said, "I thought you had gone on the road;" Mr. Gardner said, "I have gone;" testator replied, "you can't fool me, you need not attempt it;" testator's disposition towards propounder was as kind as witness ever saw a father towards a son; this feeling continued

Gardner *et al. vs.* Lamback.

even to his death-bed; just before his death whenever pro-
pounder left the room he would say, "Buddy, don't leave me;"
several times he would be supposed to be dying when the
family were not in the room, and they would be called in to
hear his dying requests; the last time, or shortly before the
family were called to his bed to see the last, he said, "son
George, come here;" propounder went to the bed and leant
down over his father; testator embraced him and told him
that we all had to die, that it was something we all had to do;
propounder and Mrs. Lamback were standing by the bed, side
by side; propounder leant over him and he placed his arms
around his neck; he said to Mrs. Lamback, "Liz, don't cry
for me, it is something we all have to do;" he said to pro-
pounder, "Buddy, don't cry for me, it is something we all
have to do, take care of your mother"; then he said to Mrs.
Lamback, "you will miss me." A few days after August
15th, Mr. Brown remarked to witness that he had slept with
testator on the bed, and he talked a great deal, but better than
usual, that if they would let him alone he would get well,
that they had made Mr. Lamback make a will to suit them-
selves, but it would not stand; witness asked if it would be
contested on the ground of insanity? he replied that it would;
Mrs. Lamback asked witness once to talk with testator about
making a disposition of his property; she did not intimate
to whom it should be given; heard Mr. Brown say that tes-
tator attempted to shoot himself; testator never represented
to witness that he was in abject poverty; he said one day
when witness called, "John, I am glad to see you, but I have
not got anything for you to eat;" witness did get something
to eat; saw testator either in the latter part of last August or
first of September; witness does not know how much mind a
man must have to make a will, but never saw testator when
he did not think him capable of attending to ordinary busi-
ness, whether that is mind enough to make a man capable of
making a will, witness cannot say; on the subject of his prop-
erty his mind was affected, and yet he would talk rationally
on other subjects; he did not believe he had much property;

Gardner *et al. vs.* Lamback.

does not think he expressed any opinion to Mr. or Mrs. Brown as to the sanity or insanity of testator shortly after his death; witness is stopping at propounder's house.

George F. Lamback, sworn: Witness is the propounder of the will and the executor named in it; in July last, testator told witness that he wished to make his will; sent for Mr. Phillips, carried him to testator's room and left him there; in a day or two more testator told witness to go and see Mr. Phillips again and get him to bring the will; Mr. Phillips told witness he would bring it up that afternoon; he did not come; testator waited a week; he called me on the morning of August 15th last and told me to get some one else; asked him who? said it made no difference; witness having been acquainted with Clay Foster all of his life, went to his office and told him testator wanted him to fix his will for him; he came by the shop a little while afterwards and witness carried him to the parlor; called testator from the next room; they went into the parlor and witness left them there; Mr. Foster came out after a little while and said he would be back that evening; he came back that evening; carried him into the parlor; testator was in the room where his wife was sick; told him Mr. Foster was waiting for him; he went into the room and witness left; forgotten whether it was before or after that that witness went for the witnesses; Mr. Foster told witness that it would be necessary to have three witnesses to the will; saw McLaughlin, Young and Clay, and they went over with witness; while they were there witness was in his room; his wife told witness that testator was calling him; went to the door and asked what was wanted? McLaughlin came to the door and said they wanted pen or ink; carried a pen to the door and handed it to McLaughlin; does not know what was transacted in there; was not present when the will was executed; next saw the will when witness got it from Mr. Foster's sister; never had any conversation with Mr. Foster about the will or its contents; testator transacted important business in July last; indorsed one note for Mr. Gardner in May, another in July, and another in September. "Note

dated July 19th, 1871, signed by H. A. Gardner, indorsed by Fred. Lamback, for $250 00," presented to witness. That is testator's signature; testator was last at the shop in August; he came to show witness how to cook some syrup to crystalize fruit. Testator advised witness to vote against the enlargement of the canal; witness followed his advice and so voted; was not in the room at the moment testator died; the last words he spoke were to his wife; he said, "Lizzie, when I am dead you will miss me;" Sister Elizabeth said, "how can we do without you;" he turned to witness and said, "Buddy, don't cry for me, we must all do it;" he then said, "Buddy, you must take care of mother now." At the time in April that Gardner wished testator to indorse his note for him, it was for $500 00; Gardner told witness he had asked testator to indorse for him and had failed; asked witness to try and get testator to indorse for him; witness told testator that Gardner wanted him to indorse a note for $500 00 for him ; he replied, "don't bother me about that any more;" witness regarded himself as testator's favorite-child ; he was so regarded by the other members of the family; Mr. Gardner and witness' sister were married in 1856; he was four years in the army, a short time in Appling county, and he left testator's house about two years ago; Mr. Bowen came to the shop and asked witness about the pistol; told him not to let testator have it because witness was afraid he would shoot himself; did not tell him testator was crazy ; never saw testator attempt to take his life; it was reported that he had done so in May or June last, and not in the latter part of August ; the note of July the 19th, indorsed by testator was given in renewal of the note of May 19th ; never cursed testator in his life, nor cursed at him ; has cursed in his presence ; testator brought witness up more like a companion than his son; talked with him as he would with a boy ; Clara Butler said before and after the will was executed that there was nothing in the world the matter with testator; when the will was read mother asked Mrs. Gardner, "are you satisfied?" She replied "yes, mother;" then turning to Henry Gardner, mother said, "are

you satisfied?" he replied, "I am if Elvira is." Mother asked again of Elvira, "are you?" she replied, "I am." Mr. Butler was drunk when he was in Augusta in November; Mrs. Butler said to him, "you ought to be ashamed to get drunk when father is dying;" Butler himself said that he had been taking too much that evening. At the time testator executed the will he was capable of disposing of his property or of doing anything else; witness thought if a man was capable of indorsing notes and loaning money he could do anything else; witness is twenty-seven years old; the property on Broad street was named after Clara, "Clara Hall;" always lived with testator, except when witness was in the army; testator furnished a substitute for witness; don't know how much was paid out for witness; testator would sometimes give witness $1 00, sometimes $5 00, as he wanted it; had no stated allowance; just after the war testator, Gardner and witness went into regular business together; that was terminated in 1867; the business was carried on after that in the name of Frederick Lamback & Son; this firm never has been actually dissolved; the shop was closed in the summer of 1870; commenced manufacturing candy in his own name in February, 1871; this continued until witness entered into business with George McLaughlin; witness filled up the body of the checks presented to him; witness collected testator's rents and paid out the money for house expenses, paid some bills for him; commenced collecting for testator about April 5th, 1871; witness expended most of the money himself; testator was not unfit for business; he did nothing in particular, because he did not feel like walking around; he said witness was the proper person to do it; Wells & Clay threatened to move out of the store unless repairs were made; testator refused to have the work done; told testator he had better have the work done, or Wells & Clay would move out; don't know whether it was owing to the influence of witness that testator made the repairs; did not influence him to withdraw his refusal; it was Wells & Clay; witness nailed down the windows because he was afraid testator might drown himself; has

Gardner *et al. vs.* Lamback.

taken a pistol out of testator's desk; saw testator with a pistol loaded with balls; don't know whether there was powder in it or not; testator said he attempted to commit suicide; did not tell Clay not to sell testator any poisonous medicines; was told that testator had attempted to poison himself with morphine, but had no reason to believe it; no members of the family lived in testator's house after witness was married; thinks his mother said she had told testator to draw his will; notified Clay and his clerk not to sell poisonous medicines to testator; expressed the opinion just after the war that testator's mind was not right, that he was impressed with the belief that he was a pauper; did not remain of that opinion a great while; did not consider him during that time unfit to dispose of his property; he said he was very poor; witness afterwards knew his means and saw that he did not have as much money as people supposed; he had to borrow money with which to pay his taxes; told testator once that witness was about to leave him to get something to do; he told witness not to go, that he did not know what he would do without him; testator's estate is valued in the sworn tax return at a little over $40,000 00.

Alexander Phillips, sworn: Witness has known testator for thirty-five or forty years; has known him intimately since 1849; in 1859 or 1860, testator told him that he intended to leave his property to propounder; saw testator every week during the year 1871, until he was confined to his bed; had many conversations with him; he was a little low spirited; thought that he was perfectly sane; he talked on all business topics as sanely as any body; saw him in August last; he then spoke as if he was of sound mind; last summer, two or three times, he spoke to witness about drawing his will; in the latter part of July, or in August, he changed his mind a little; first, he intended leaving everything to propounder, then he wanted to leave Mrs. Gardner $50 00 per month; witness drew a will for testator in accordance with these instructions; this instrument was never executed; drew this will in last August; testator's Green street place is worth about $10,000 00;

Gardner *et al. vs.* Lamback.

propounder told witness about testator's having been taken out of the canal; never heard that testator attempted to kill himself, either with morphine or with a pistol; in conversations with testator, he, and sometimes witness, led; heard that testator's mind was affected, but did not notice it; testator said to witness that he intended to leave all of his property to propounder, because he had spent a great deal of money on his daughters and their husbands, and that propounder had always worked for him and had been a good son; this was in 1871, but the evening propounder was born, and ever since, he always said that propounder should have wonders done by him; that he should have everything; that was a convivial occasion; we took two bottles of champagne; saw nothing in particular filthy about him last summer; when in the streets, he was cleanly; when in a sick room, he was dressed as a man naturally should be.

Propounder closed.

## EVIDENCE OF CAVEATORS.

Edward B. Pierce, sworn: Was in the employ of testator from 1852 to 1862; saw testator in April, 1869; did not seem to be looking as he had been before; conversed with him; cannot remember any particular topic; from his conversation he seemed to be faulty in his mind; thinks he improved for some time afterwards, until probably a year ago; met him again and talked to him some time before he recognized witness; he was despondent; said he was a pauper; witness remarked that he did not think him much of a pauper, that he must have $40,000 00 or $50,000 00; he replied, "what is $40,000 00, I have worked forty years, I ought to be worth a million, I have lost everything;" thought several times that witness met him that he was not perfectly sane; saw him last on one Sunday in July; he looked very strange; witness remarked it to his wife; Clara Hall was named after testator's daughter, Clara; thought she was the favorite.

W. H. Clay, recalled: Has been a tenant of testator's since March, 1870; when testator applied to witness for morphine

he appeared to be crazy; he was evidently not himself; propounder asked witness not to sell him poison, as he was an insane man and would kill himself; he called several times; we always played a ruse on him, putting up quinine instead of morphine; thinks propounder had considerable influence over testator; this was demonstrated in reference to the repairs on the house occupied by witness; could get nothing done until he applied to propounder, and then it was soon accomplished; paid rent the last four or five months to propounder; he told witness that testator was incapacitated to attend to business, and that he collected the rents himself; the attesting clause to the will was not read over to witness before he signed; don't think he testified before that it was; remembers that testator admitted that it was his will, but does not remember whether that clause was read.

Wellington Stevenson, sworn: In 1865 witness made a memorandum of a contract with testator for the lease of his store under Clara Hall, for five years; the rental was to be $1,500 00 in currency; afterwards he stated that he would not give the lease on that basis; that he did not consider his mental condition such at that time as to render that contract binding; he required $1,800 00 in gold; his physician said that testator was not fit to make a contract; the contract was abrogated; when the subsequent contract was entered into, witness considered him all right.

W. E. Dearing, recalled: There is nothing in the testimony of Mr. Foster that would cause witness to alter his opinion as to the sanity of testator; on the 16th or 17th of August said to Mrs. Brown that testator was as crazy as a loon; did not say before Mrs. Fargo or Mrs. George Lamback that nothing was the matter with testator's mind; may have said that he refused to take the medicines and intended to starve himself to death; receipt exhibited to witness dated May 8th, 1870; witness signed that receipt; the money was paid by propounder in the presence of testator.

M. J. Jones, sworn: Witness is a physician; frequently met testator previous to his death; never conversed with him

a great deal; noticed in the last interviews that he seemed changed; witness lives opposite the house of testator's daughter, Mrs. Gardner; frequently testator would visit her on Sundays; one Sunday witness met him on the south side of Broad street, near Boundary; had at other times met him often going to the river; asked him where he was going? he said to his daughter's; witness told him he was mistaken, showed him where it was; talked with him, and finally told him if he would walk back witness would show him the way; showed him where Mrs. Gardner lived, as he seemed to have forgotten the way; he seemed bewildered; thought there was something wrong, though his conversations previously were generally right; on this occasion witness was particularly impressed; he always drank a little; thought he might have possibly taken too much; he walked steadily; thought he was not right; this circumstance happened last summer; met him coming from the river during the summer months.

Doctor Sweeney, sworn: Has known testator for fifteen or eighteen years personally, not professionally; noticed a change in him first the year after the war; had several conversations with him; he said he was penniless and a beggar; thought him insane.

Caveators closed.

Some documentary evidence referred to in the testimony was introduced, unnecessary here to be set forth.

The Court charged the jury, after giving in charge and refusing various requests in writing, which appear in the motion for a new trial, as follows, to-wit:

GENTLEMEN OF THE JURY:

"This action has arisen upon appeal from the Court of Ordinary of this county, which Court has original jurisdiction in the probate of wills.    The will of Frederick Lamback was produced to that Court for probate, in solemn form, and the heirs-at-law of Frederick Lamback filed a caveat to the will, upon the following grounds:

"1st. Because it is not the will of Frederick Lamback, as

at the time of the alleged execution of the paper, he was not of disposing mind and memory.

"2d. It is not the will of Frederick Lamback, because while executing it he was under the influence of his son, George Lamback, the propounder, and so did not execute it freely and of his own accord.

"3d. It is not the will of Frederick Lamback, because he thereby undertook to dispose of property which he had by deed, dated February 4, 1858, conveyed to Henry Gardner, in trust for the wife and children of him, said Frederick Lamback.

" In the hearing before the Ordinary, he sustained the validity of the will, and admitted it to probate, and to this judgment of the Ordinary the heirs at law, the caveators in this case, have appealed to this Court, and it becomes your duty to determine the issue thus made between the propounder and the caveators, and you are to do this, gentlemen, upon the evidence, and the application of the law to the evidence, as shall be given you in charge without regard to, and irrespective of, the proceedings in the Court below, and the issue there determined.

"The questions for you to determine from the evidence are:

"1st. Whether the instrument propounded contains the wishes and acts of Frederick Lamback, the testator.

" 2d. Whether he had the mental capacity to make a will.

"3d. Whether he made it freely and of his own volition: Code, 2359, 2360, 2364, 2366, 2367, 2370, 2372, 2373, 2374. The right to make a will is one of the highest privileges which a man may enjoy in this State; he may, by his will, make any disposition of his property he pleases, and his freedom in this respect will not be restricted and controlled, or his discretion circumscribed, provided his testamentary expression or disposition contravenes no rule of law, or is not inconsistent with the policy of this State, and you have seen from the law, read in your hearing, that in the exercise of this discretion he may, if he sees proper, bequeath his entire property to any person or persons, to the exclusion of his wife and children, or may leave it to one child to the exclusion of the re-

maining children, and the Courts will sustain his will not with-standing the perpetration of injustice by its provisions, or the exercise of a capricious or unreasonable preference; provided always, that at the time of making the will he has sufficient testamentary capacity to do so, and there is no evidence of col-lusion, fraud, undue influence, or unfair dealings operating upon his volition, and controlling his discretion: Code, 2364. This rule is not so strong where the testator leaves his prop-erty to one child to the exclusion of the others; but while this act and conduct is not, in itself, any evidence of insanity or mental aberation, it is a circumstance unexplained and unaccounted for, to be duly weighed and considered by you, gentlemen, added to the other facts and evidences of insanity, or mental incapacity, if any is found to exist, in determining that issue. It is, however, gentlemen, my duty to say to you in this connection, that the reasonableness or unreasonableness of the testator's disposition of his estate may be explained or reconciled by any antecedent expression of similar or the same wishes, when in a state of sanity. All these facts are compe-tent to be considered by the jury, as well as all the circum-stances surrounding the testator, and operating on his mind, in shedding light upon the motives which influenced his mind. I do not mean to intimate, for it is not true, that antecedent wishes will be carried out if the testator is insane at the time of making the will, I only give you this as a fact to be con-sidered by you in reconciling an inconsistent and arbitrary disposition of his property. The principal and important ground relied upon by caveators, in this case, is the insanity or want of testamentary capacity of the testator.

"In all cases of this character the law presumes the sanity of testator and it is incumbent on the caveators to establish the insanity to a reasonable extent. An insane man cannot make a will if he be insane at the time he makes it, and if you believe, gentlemen, that the evidence establishes insanity in this case, that Frederick Lamback, the testator, was wholly insane at the time of making his will, this settles the question beyond all controversy, and you are bound to find your ver-

dict in favor of caveators, as insanity voids the will, and is totally and entirely inconsistent with the idea of testamentary capacity; or if you believe from the evidence that he was partially insane and that the will itself is the offspring of it, it will be invalid notwithstanding the ordinary and general capacity be established.

"I repeat, therefore, if you find the testator was insane, or *non compos mentis*, at the time he made the will, you cannot set it up. I have charged you that there is no fixed standard of insanity. One of the tests I have already given you, the comparison of the insane person with himself—of his conduct at periods when he is alleged to be insane, with his conduct at periods when he is admitted to be sane; of the facts, you are the judges. I repeat, therefore, if you find the testator was insane, or *non compos mentis*, at the time he made the will, you cannot set it up, and your duty is clear.

"If you find that testator was not wholly insane, or *non compos mentis*, you are next to determine whether he had sufficient testamentary capacity to make a will, and I charge you that there are no well defined and well settled rules to guide you in arriving at your conclusion.

"From the very nature of the case, gentlemen, it is extremely difficult and, I might say, perplexing, to draw the line between capacity and incapacity.

"There is a distinction between mental imbecility and insanity or lunacy : one, generally, as you well know, flows from and is the offspring of natural causes—an inherent mental weakness, the other the result of distempered intellect, and a diseased mind and disordered mental organization.

"A man may make a will with very little mental capacity, and may be far more capable of doing so than a man of strong natural intellect, under the influence of insanity or mental hallucination. A man may be possessed of strong peculiarities, or he may have eccentricities and vagaries of an extreme nature, or whimsicalities amounting to folly, and yet be able to make a will; his weakness of intellect must amount to posi-

Gardner *et al. vs.* Lamback.

tive imbecility to vitiate it; if it does amount to this, the testamentary capacity is gone.

"You have seen, gentlemen, from the diversity of opinion read in your hearing, that there are a variety of tests suggested to the mind on this subject, some apparently irreconcilable with others. The Code defines the amount of intellect necessary to constitute testamentary capacity to be "that which is necessary to enable the party to have a decided and rational desire as to the disposition of his property." A higher authority declares, that if a testator comprehends common ideas, plainly expressed, he has sufficient capacity to make a will. One authority has gone further, and declared that a mere gleaming of reason is sufficient. It is a well settled principle of law that a lower degree of intellect is necessary to make a will than to make a contract. Well, gentlemen, what is the true test, upon an analysis of the whole law on this subject, taking it together and giving it a solution and interpretation consistent with the apparent different dicta on the subject, and the whole harmonious with the different views of the law, as collated? And now, gentlemen, I present to you a common sense view of the subject, and I charge you that facts which are laid down by the highest authority as decisive tests of testamentary capacity are that the testator knows the contents of what is written as his will; that he comprehends his relations to his family and theirs to him, the nature of his estate and disposes of the same with understanding and with reason. If, therefore, you believe that Frederick Lamback knew the contents of what was written as his will; that he comprehended his relations to his family and theirs to him, the nature of his estate, and disposed of the same with understanding and with reason, your verdict should be for the propounder; if you believe on the contrary that he did not understand these relations, did not comprehend the nature of his estate, and did not dispose of the same with understanding and reason you will find for caveators.

"Of these facts, gentlemen, you are the exclusive judges. I have endeavored to invoke the principles of law and you

must apply them. As to influence—honest persuasions by a son upon the mind of a father of sound mind are not such persuasions and is not such influence as is contemplated by the law as sufficient to vitiate the will; but if the influence is such as is calculated to effect or prevent a weak mind, or a diseased or distempered intellect—influences which would prevent the proper exercise of discretion, this is inconsistent with the idea of volition and should vitiate the will; there must be a moral coercion, and influence affecting his free agency which constrains him to do what he otherwise would not have done."

The jury returned a verdict in favor of the propounder. Caveators moved for a new trial, upon the following grounds, to-wit:

1st. Because the verdict was contrary to law.

2d. Because the verdict was decidedly and strongly against the weight of evidence.

3d. Because the verdict was contrary to the charge of the Court, " that in order that one may make a valid will he must have that amount of intellect which is necessary to enable him to have a decided and rational desire as to the disposition of his property."

4th. Because the verdict was contrary to the charge of the Court, "that if one who undertakes to make a will is shown to have been insane previously, presumption is that he continued insane, and it is incumbent upon the propounders to show that his mind was restored, and that he executed the will in a lucid interval, and without any assistance from others."

5th. Because the verdict was contrary to the charge of the Court, "that if it is shown that the testator was generally insane, but it is claimed by the propounder that the will was made in a lucid interval, such lucid interval must be clearly shown, and great caution must be exercised in ascertaining whether such lucid interval did really exist."

6th. Because the verdict was contrary to the charge of the Court, "that an insane man cannot make a valid will, even

Gardner *et al. vs.* Lamback.

though it be such a will as before his insanity he intended but failed to make; he must be sane at the time of making his will, otherwise the will is not his will, however reasonable and in accordance with his intentions when sane it may appear to be."

7th. Because the Court refused to charge the jury as requested, "that there is no fixed standard of sanity, the test of insanity is the comparison of the alleged insane person with himself—of his conduct at periods when he is alleged to be insane, with his conduct at periods when he was admitted to be sane. The test of insanity is delusion, the belief in the existence of that which does not exist, as for instance the belief of a man of large means that he has not the means to buy the common necessaries of life, and medicines prescribed by his physician." The Court charged the first part of the request, concluding at the word "sane," and said that such delusion was one of the tests but not conclusive.

8th. Because the Court refused to charge the jury as requested, "that in order that the delusion should be such as will invalidate the will, it need not be a delusion as to the persons to be affected by the will, it is sufficient if the delusion is such as to affect the subject matter to be disposed of by the will." The Court says he refused this charge because he could not charge the jury that a delusion as to the amount of the property would invalidate the will, but did instruct the jury that said delusion was a circumstance they might weigh in determining the question of sanity or insanity.

9th. Because the verdict was contrary to the charge of the Court, "that the office of a subscribing witness to a will, under our Code, is not to adjudge the mental capacity of the testator, his act is to bear witness to the execution of the paper."

10th. Because the verdict was contrary to the charge of the Court, "that the amount of intellect necessary to constitute testamentary capacity, is that which is necessary to enable Frederick Lamback to have had a decided and rational desire as to the disposition of his property."

11th. Because the verdict was contrary to the charge of the Court, "that this desire must be decided and rational, and exist at the time of the making of the will."

12th. Because the verdict was contrary to the charge of the Court, "that however decided and rational it may have been at some previous time, it must appear that at the making of the will the desire still remained the same."

13th. Because the verdict·was contrary to the charge of the Court, "that if it appears that Frederick Lamback was a monomaniac, it must appear that the will is in no way the result of, or connected with, that monomania, and that the will does speak the wishes of the testator at the date thereof, unbiased by the disease with which he was then affected."

14th. Because the verdict was contrary to the charge of the Court, "that if it appear that the freedom of volition of Frederick Lamback was in any way destroyed by practices upon his fears, or by undue influence of George Lamback, the will is invalidated."

15th. Because the Court refused to charge the jury, "that a persistent want of cleanliness and failure to observe the decencies of society by a man who had previously through life lived in a directly opposite manner, are strong indications of insanity." This request was given, the word "strong" being stricken out.

16th. Because the verdict was contrary to the charge of the Court, "that it is not necessary that the influence of the propounder should appear to have been directly exercised, and if through fears or through the affection of testator for his wife, who was then supposed to be dangerously ill, a will was made, it was not freely or voluntarily made."

17th. Because the verdict was contrary to the charge of the Court, "that if testator had been shown to have been insane at any time before the making of the will, the *onus* rests upon the propounder, to show that he executed the will in a lucid interval and without any assistance from others."

18th. Because the verdict was contrary to the charge of the Court, "that when the will is attacked upon the ground of

fraud of propounder he should produce clear and satisfactory proof of the *bona fides* of his conduct in the matter."

19th. Because the Court refused to charge the jury, "that if it appears that at any time prior to the making of the will, that Frederick Lamback himself repudiated his own contract, upon the ground that he was mentally incapacitated from making a contract at the time, and which contract was modified to suit his new demand, it is conclusive evidence of testator's own opinion of his sanity at that time." This was given, striking out the word "conclusive."

20th. Because the Court charged the jury, "that a testator, by his last will may make any disposition of his property not inconsistent with the laws, or contrary to the policy of this State, and it is not inconsistent with the laws, nor contray to the policy of this State to give to one child more than to others."

21st. Because the Court charged the jury, "that the words not of sound and disposing mind and memory are legal terms, and import a total deprivation of reason."

22d. Because the verdict of the jury was contrary to the charge of the Court, given to them at the conclusion of the request of counsel for the parties.

23d. Because the Court refused to grant a new trial upon the grounds of the newly discovered evidence, set forth in the affidavits of Henry W. McTyre, D. R. Wright, and Sarah B. Clarke, annexed to the motion for a new trial.

In support of the last ground were attached the affidavits of the witnesses therein named, setting forth facts of the same general character as were testified to by the witnesses of caveators upon the trial.

The Court rendered the following decision:

" The motion for a new trial in this case has been made upon a number of grounds, but those mainly relied on are, that the verdict was strongly and decidedly against the weight of evidence; contrary to the charge of the Court; that the Court erred in its charge to the jury, and because of newly discovered testimony. I have carefully considered the various

grounds relied on, after argument had, and am satisfied that the charge to the jury taken in its totality was a fair submission of the case ; that if there was error at all it was not sufficiently material to have misled the jury under the whole charge. The newly discovered testimony is, in my judgment, in the main cumulative and not material in its nature, and would not, in my opinion, if offered, have changed the verdict. According to the repeated rulings of the Supreme Court, I will not set aside the verdict on the grounds that it was decidedly and strongly against the weight of evidence, as in my judgment, there was sufficient evidence to have supported a verdict either way. It is therefore ordered that the motion and grounds for a new trial in this case be and the same are hereby overruled and a new trial refused."

Whereupon caveators excepted, and now assign said ruling as error upon each of the aforesaid grounds.

BARNES & CUMMING; FRANK H. MILLER, for plaintiffs in error.

The opinion of the attending physician was sought on the day of the execution of the will. This circumstance should require of propounder full and strong proof of a disposing capacity: Christy *vs.* Clarke, 45 Barbour, (N. Y.) 529.

1st. The terms *non compos mentis,* insane and lunatic, are not one and the same, but each include all persons of unsound minds : Code, section 5. Insanity is not defined by the Code, but it must not be confounded with either great weakness of mind, nor with marked eccentricities of habit or thought: Code, 2372, 2373, 2374. Beck uses the term mental alienation as descriptive of insanity: Beck's Medical Jurisprudence, volume 1st, pages 716 and 770. The true test is the comparison of an individual suspected of being insane with himself when sane. The true criterion is contained in the term delusion: Dew *vs.* Clark, 3 Adams, pages 440, 441, 442, 484. Its essential feature, says Hammond, probably the latest authority on the subject, is delusion: Hammond on Nervous System, page 345. ·Delusion must not be confounded with hal-

lucination or with illusion. In hallucination, sensations are perceived without any object to excite them being present. The patient sees persons or hears voices, though neither persons nor voices have any real existence. Illusion exists when there is a false perception of a real object, as when a person sees a ball roll over a floor, but imagines it to be a mouse. Delusion consists in a false belief, which is not the result of a false process of reasoning. As a man who believes that he is Mohammed, that his legs are made of glass, that one of his arms is gone when he has two, that he has ceased to sleep when he does sleep, that he has nothing to sustain life when he has abundance. Hallucination and illusion, though they frequently coexist with insanity, may exist without it, because, by the use of reason, a man may correct his false sensations, but delusion cannot be present when the mind is perfect: American Encyclopedia, volume IX., Article, Insanity, page 540; Hammond, 339 to 345. The existence of this delusion must appear in something contrary to the customary mode of thought of the individual: Hammond, 341. A man laboring under a delusion, contrary to his customary mode of thought, is an insane man, notwithstanding his mind may have great strength. He reasons from a false premise, although his reasonings may be perfectly logical: Hammond, 347. The case of such a man is not that of one wanting in capacity to make a will on account of weakness of intellect. Nor is it the case of a man whose habits of thought or conduct are eccentric, for the manifestations of these are not founded on *delusion:* Hammond, 331. Weakness of intellect or imbecility, or different degrees of capacity, have reference, not to insanity, unsoundness of mind, delusions or perversions of intellect, but to the amount or strength of mind. It requires a greater amount of intellect to make a contract than a will, a greater amount to make a complicated contract than a simple one, and so it would require a greater amount to make a complicated will than a simple one. But these questions do not arise in the case of insane persons in either civil or criminal matters. In criminal matters, if a man has a *mere glimmering of reason*

sufficient to distinguish between the right and wrong in refer-
ence to the particular act to be committed, he is responsible;
but if the act is in consequence of some delusion under which
he labors he is not held responsible, although he may be able
to distinguish between the right and wrong of the act itself:
3 Kelly, 310. In the case of a caveat to a will, on the ques-
tion of insanity, the question is, had the testator capacity to
make a will; not had he capacity to make the will produced.
If *compos mentis,* he can make *any will, however complicated,*
if *non compos mentis,* he can make no will, *not the simplest:*
United States Digest, volume 23, page 594; Delafield *vs.*
Parish; 25 New York (11 Smith,) 9. An insane person is
*non compos mentis.* A feeble minded man may be *non com-
pos mentis,* but he is not necessarily so, and is not so, unless
totally deprived of understanding. When the decisions use
the words *non compos mentis,* as supporting total deprivation
of understanding, they are applying the term, not to the case of
persons insane, of deluded, perverted minds, but to persons of
great feebleness of intellect: See Potts *vs.* House, 6 Georgia, 324,
where it is used. The evidence in reference to Potts, page
326, does not conduce to establish a case of insanity. Insan-
ity is nowhere ever alleged: See page 352, where Judge Lump-
kin holds that a party who has a glimmering of reason can
make a will, but see also page 357 and 358, where he guards
against his language being made applicable to cases of de-
rangement. Again, in his explanation in Terry *vs.* Buffing-
ton, 11 Georgia, 345, he illustrates his meaning by reference
to the growth of intellect from the weakness of childhood to
the strength of youth, and by its decay from its strength in
manhood to its weakness in enfeebled old age. The cases of
Hall *vs.* Hall, 18 Georgia, 40, and Gaither *vs.* Gaither, 20
Georgia, 709, are not cases of insanity, but of great feeble-
ness of intellect. In Morris *vs.* Stokes, 21 Georgia, 552, the
Court below charged "that be the testator wise or unwise, yet
he is capable of willing his property, unless *totally deprived of
reason.*" The Court is speaking of the case of a young man
of alleged feeble intellect, not a case of insanity. And here

Gardner *et al. vs.* Lamback.

Judge Lumpkin says, pages 571 and 572, " if imbecility, and not a total absence or perversion of mind, should constitute inability to act, it is impossible to draw a line of distinction." Here are two things which constitute inability to act—one, perversion of mind; and another, which exists in cases of imbecility, total absence of mind. So, in 33 Georgia, Kenan *vs.* Stansill, Judge Walker, in the Court below, uses *non compos mentis* as importing total deprivation of understanding, but Judge Jenkins says all he (Judge Walker) may have said, or all the Supreme Court may say, must be taken apart from cases of established insanity. Upon the same point, 3 Denio, 37. These authorities do not apply, and in solving the question of F. Lamback's testamentary capacity, we do not inquire into the strength of his intellect, as to whether or not he was totally deprived of reason, but only the test known to the law in such cases, and that is mental delusion : 26 United States Digest, 563 ; Seamen's Friend Society *vs.* Hoppes ; 33 New York, 619. Did Frederick Lamback, at the time of the execution of the paper, labor under delusions contrary to his customary mode of thought? That such was the case is shown in great part by the testimony offered by the propounder. These witnesses show that Mr. Lamback was formerly a man of great neatness in his personal appearance, strict and attentive in his business, and affectionate in his family. During the latter part of his life, and for months prior to the execution of his will, he had become careless, did nothing in particular, he had sunk into a state of melancholy, and his mind was affected on the subject of money and property. To such an extent had this proceeded, that great precautions were taken to prevent him from taking his life; the windows of his room were nailed down to prevent his escaping; he was watched at home, by a servant when abroad; druggists were notified not to sell him poison; gunsmiths not to let him have a pistol, etc. See testimony of Dr. Clay, George Lamback, Mrs. Fargo, Mrs. George Lamback, John Everett and A. Philip. Mr. Philip is introduced also to show that he had always contemplated making such a will as is offered. His

testimony is inconsistent with Mr. Lamback's own acts in reference to his disposition of his property, as shown by trust deed of 1858. The reason assigned, to-wit: that his son had worked for him, is unsupported by any evidence. But if he had so contemplated, it could not have rendered a will made by him when insane valid, no more than an insane man could be punished for a homicide committed by him when insane, which he contemplated when sane: See Griffin *vs.* Griffin; R. M. Charlton, 217. Philip only sees in Lamback great depression of spirits, low melancholy. He sees the symptom, but an expert infers from it the existence of disease. What was it? It was a perversion of understanding, arising out of his delusion in reference to his poverty. This caused him to be guarded, and made him dangerous to himself: Hammond, 336 and 364. The testimony for the caveators shows that he was treated by the family as insane; that the propounder himself had repeatedly said that he was; that he had time and again attempted to take his life; that he believed himself to be in abject poverty; that he did not know the property of which he was possessed; that he believed he could not sleep when he did sleep; that he had no blood in his body; that his heart had ceased to beat; that he could not eat, when he did eat; that he was unable to buy food or medicines; that he had not slept for weeks or years; that he finally starved himself to death; that he constantly sought self-destruction; that all these witnesses regarded him as insane; that he actually believed at one time that a part of his body was gone, and that he labored under these delusions as to poverty and inability to sleep on the day the will was executed; and that he had the appearance of a crazy man, having anxious, wild-looking expression in his eyes, as shown by the witness McWhorter. See testimony of Sharp, Mrs. Gardner, Mrs. Brown, Angus Brown, Butler, C. T. Schaupp, E. B. Pierce, W. H. Clay, W. D. Bowen and E. G. Pritchard. But upon these points the medical testimony is overwhelming. In the opinion of his family physician, his mind was permanently affected from the latter part of 1870 until his death. He was

crazy as a loon the day he executed the will.  He constantly labored under these delusions, and there was no time for six or eight months prior to his death when he was free from them.

The testimony of O'Dowd, Captain Young and Hickey is offered to show that he was rational on other matters.  But see what our Supreme Court says about such evidence: Lucas *vs.* Parsons, 27 Georgia, 624 and 625.  But on the other hand, as to the opinion of the attending physician: 6 Georgia, 335; 1 Peters C. C. Reports, 163; 3 Wash., C. C., 587.  The review of the law and the testimony, it is insisted, sustains us in the 2d, 3d, 6th, 7th, 10th, 11th and 12th assignments of error, which refer to weight of evidence and testamentary. capacity.  The evidence of the witness on the subject of cleanliness fully sustains us also on the 15th assignment of error. See the case of Shuttleworth, E. C. L. Reports, 58, page 650; 9 Adol and Ellis, 651.  But our position is strengthened by reference to the will itself, its gross inequalities and unnatural injustice.  Where a will is contested on the ground of insanity, the fact that the will makes an unnatural and inequitable distribution is a circumstance conducing to establish incapacity: Fountain *vs.* Brown, 38 Alabama, 72.  Gross inequalities require satisfactory evidence that the will was the free and deliberate offspring of a *rational, self-poised, and clearly disposing mind,* and where such evidence is wanting the will should be set aside: United States Digest, volume 25, page 525; Harrell *vs.* Harrell, 1 Duvall, (Ky.) 203.  Such a will, added to other proof, which would of itself leave the question doubtful, ought to turn the scale: Judge Gibson in Boyd *vs.* Gordon, 6 Seargent & Rawls, 54.

2d.  If the delusion of testator was confined to one object or a class of objects, his disease was monomania: Hammond, 336.  A will, the result or offspring of monomania, is void: Code, 2372.  Lamback, laboring under the delusion that he is such a pauper he cannot provide for his children, leaves all to his son, in order that his wife, in her exceedingly feeble state of health, may be provided for.  If he had but a single delusion his mind would nevertheless be unsound: See Mauds-

ley on the Mind, pages 324, 326 and 327.   A partial delusion constitutes unsoundness as much as a perfect delusion: Dew *vs.* Clark, 3 Adams, page 484.   It will make no difference whether it be as to legatee or subject matter: Potts *vs.* House, 6 Georgia, 325; and a testator, partially deranged as to either, will be considered as wanting in respect to testamentary capacity as regards the particular will, however unimpeachable his character and capacity in other respects: *Ibid.* The refusal of the Court to charge on this point, as set forth in the eighth assignment of error, is in the teeth of this decision in 6 Georgia.   In Parsons *vs.* Lucas, 24 Georgia, one of the grounds of caveat is an insane delusion in reference to caveator.   The Court below charged on this point, pages 650, 651.   No assignment of error was made specially on account of it.   It was not even made the special ground of an application for a new trial, and yet on this ground alone the Supreme Court granted a new trial: pages 661, 662.   See, also, 1 Littell (Kentucky,) 375.   Frederick Lamback was just as much under the influence of a special delusion as to the subject matter of his will, his property, as Lucas was as to one of the legatees.   See Pritchard's testimony as to Lamback's tax returns, and testimony of all the witnesses as to his opinions about his poverty.   Whenever a person once conceives something extravagant to exist which has still no existence whatever, and he is incapable of being permanently reasoned out of that conception, he is said to be under a delusion, and delusion in this sense of it is almost, if not altogether, a convertible term with insanity.   And when a man is under a delusion in relation to his property he is incapable of making a will: Stanton *vs.* Witherax, 16 Barb., 259; 14 United States Digest, 591; Red. on Wills, pages 80 and 87.   When there is testimony in a case conducing to prove that a will is the direct consequence of the delusion under which the testator labored, a delusion calculated to pervert his judgment with respect to the disposition of his estate, it is perfectly clear that he could not be considered as possessing a testamentary capacity, although upon other subjects he may have been rational

Gardner *et al. vs.* Lamback.

and sane: 12 United States Digest, 597; Townsend *vs.* Townsend, 7 Gill., 10. It is respectfully submitted that on this, one of the most important branches of the case to the caveators, the refusal of the Court to charge the request set forth in the 8th assignment of error, was most clearly erroneous, and that the charge of the Court was calculated to mislead the jury.

3d. The party asserting a lucid interval must establish it beyond a *reasonable doubt,* in the case of a party adjudged a lunatic: Lucas *vs.* Parsons, 27 Georgia, 633. On the question of the validity of a will, where there is uncontradicted evidence of general insanity at a particular period, the *onus* of showing a lucid interval at the very time of the subsequent execution of the will, lies on the party claiming under it. It is not sufficient that there is evidence of sanity before and after the day on which the will is made, and the jury cannot be permitted, from such evidence, to infer that a lucid interval intervened, during which the will was executed: Harden *vs.* Hays, 9 Bar., 151. By a perfect interval is meant an interval in which the mind having thrown off the disease has recovered its general habit: Lord Thurlow, Beck's Medical Jurisprudence, pages 779 and 780; Brown's Chancery Reports, volume 3, pages 369 and 370. To decide the existence of a lucid interval the mind should be tested. He should be able to describe his feelings, and talk of the subject of his delusions without betraying any signs of unnecessary vehemence or excitement: Taylor's Medical Jurisprudence, 56. See Dearing's testimony on this point. Was testator subject to any such test? Not in the interview with Foster, nor is it disclosed in the testimony of other witnesses—George Lamback, his wife and mother-in-law. This testimony is as to rational conversation on other topics. That this amounts to nothing—see cases cited by Erskine, and mentioned in notes to Dew *vs.* Clark: 3 Ad., pages 440 and 441; and see to the direct contrary of the existence of a lucid interval, Dearing's testimony, and Mr. and Mrs. Brown's, as to condition of Mr. Lamback on the 15th of August, 1871.

H. CLAY FOSTER; J. C. C. BLACK, for defendant.

1st. A will is the legal expression of a man's wishes as to the disposition of his property after his death: Code, 2359, 2364.

2d. In propounding a will for probate in solemn form, it is the duty of the propounder to produce the subscribing witnesses, and if they depose to the sanity of the testator, the *onus probandi* is thenceforward upon caveators, and insanity must be shown by the *clearest and most satisfactory* proof: Williams on Executors, 16, (note,) 18; 7 Pick, 94; Lovelass on Wills, 141; Shelford on Lunatics, 22, 23.

3d. The right to dispose of property by will is the most cherished of all rights, and is secured by law. Before a person can be deprived of this right he must be shown to be *non compos mentis;* these are legal terms, and import a total deprivation of reason: 6 Ga., 325; 11 Ga., 339, 344; 21 Ga., 566, 571; 33 Ga., 63, 67; Shelford on Lunatics, 1; 26 Wend.

4th. Partial insanity may invalidate a will, but only when it is clearly shown that the will is the *direct offspring* of such partial insanity: Redfield on Wills, 125, 127, 128; Shelford on Lunatics, 29, 30; 7 B. Munroe, 193; Code, 2372.

5th. Neither *eccentricity,* nor imbecility, nor *incapacity to make contracts* for the purchase and sale of property are sufficient to invalidate a will: 6 Ga., 325; 4 McCord, 107; Williams on Executors, 35.

6th. A person afflicted with *general* or *partial* insanity may make a will during a lucid interval. The onus of showing a lucid interval is upon propounder *only* where general, habitual insanity is shown: 7 Georgia, 488, 489.

7th. A lucid interval is a remission of the disease sufficient to allow the party to judge soundly or generally of the act in which he is engaged: Redfield on Wills, 112, 413; Taylor's Medical Jurisprudence, 636; Williams on Executors, 201.

8th. Influence in procuring a will, to be undue, must amount to *moral coercion,* it must *destroy free agency,* and the motive *tantamount* to *force* and *fear,* and be exercised to pro-

Gardner *et al. vs.* Lamback.

cure the will: 6 Georgia, 325; 21 Georgia, 572; Cheves L,
& E., 37, 40–6–7–8; 1 Richardson L. R., 80–3–4–5.

9th. The refusal to charge as set forth in the 7th ground.
was proper: Taylor's Medical Jurisprudence, 660; Hammond
on Diseases of the Nervous System, 341.

10th. A party is entitled to a charge in the language re-
quested, or not at all. Tried by this principle, the request
was properly refused. The subject matter disposed of by the
will may be "*affected*" by the delusion and still be so slightly
"*affected*" as not to destroy testamentary capacity. All that
the law requires is that the testator should know *generally*
what property he was disposing of: 9 Iredell, 106; 33 Geor-
gia, 68, 78.

11th. The 15th request was properly refused. It is the ex-
clusive province of the jury to determine the weight of the
testimony.

12th. The 19th charge as given was correct for reasons
given for refusal of the 15th. It was irrelevant any way, as
all the caveators admitted his recovery subsequently to the
act stated.

13th. The refusal of new trial for newly discovered evi-
dence was right: 40 Georgia, 678, 718; 39 Georgia, 657.

14th. A new trial on the ground that the verdict is con-
trary to the weight of the evidence will not be granted, where
there is evidence to support the verdict.

15th. The charge, if correct, when considered in its total-
ity, a new trial will not be granted, though some portion may
be erroneous. The correctness of a charge must be determ-
ined by the whole taken together: 41 Georgia, 186, 187, 194,
195; 11 Georgia, 338.

McCay, Judge.

1. In an inquiry like that disclosed in this record, sanity
or insanity, it is dangerous to lay down any positive rules.
There is not a man living who has not done acts which oth-
ers pronounce insane; and, on the other hand, insanity some-
times eludes all ordinary inquiry. To say that delusion is

the test of insanity, is itself contrary to some of the writers upon the subject, but to specify a particular delusion and declare that a test, would, we think, be an assumption by the Judge of the powers of the jury. As to the particular delusion mentioned in this request to charge, whilst, without doubt it is such an one as an insane person might well have, yet it is no uncommon thing for great lovers of money, as they grow old, to fall into it, and yet display in all their dealings a perfect comprehension of business affairs.

2. There is the same objection to the written request as to monomania. Whilst the principle covered by the words is, perhaps true, to-wit: " that the delusion need not refer necessarily to the persons affected by the will," yet it might mislead the jury to say to them that it is *sufficient* if it affect the property bequeathed.

We think that all the truth in the charge asked, was covered by the charge as given, to-wit: It must appear that the will is not in *any* way the result of the delusion, or connected with it. The real object of inquiry in cases of this character is not so much to classify the mental condition of the testator, as to discover if the will speaks his real, intelligent intentions.

It seems to us that this is the great mistake of the plaintiff in error in this whole case. Modern writers upon the subject of insanity as a disease, include within their definition of the term many persons whom the law would punish as criminals if they violated the law, and whom the law would declare competent to make a will. The medical writers treat the subject as philosophers and as healers. The law inquires into it with the view of seeing how far society can afford to make insanity an excuse for crime, and at what point it is best for the general good, to say that a man shall not be allowed to make a will. The right to say who shall, after the death of the owner, have his property, is a right long held precious in the history of English law. A large majority of wills are made in the last hours of life, a time necessarily of pain, trial and disturbance. And it is a wise provision of the

Gardner *et al. vs.* Lamback.

law that whilst it takes great precaution to prevent fraud and imposition, it does not withdraw the testamentary privilege until the reason itself be gone. It is a precious right, and one that should be guarded with jealous care, that the aged and infirm, the weak minded and eccentric shall have this security for care and attention on a sick bed. And it may be truly said, without any harsh criticism on human nature, that many a fired brain has been cooled by gentle hands, and many a death bed cheered and watched over with kind care, which, but for this tender care of the law for this testamentary right, would have been neglected and deserted. Our Code, sections 2372, 2373, 2374, is in substance fairly given by the Judge in his charge to the jury. Nor is the law as laid down in the Code materially different from the rulings of this Court in *Potts vs. House,* 6 *Georgia,* 324. To make one incapable of making a will from insanity, he must be "*non compos mentis,*" there must be a "total deprivation of reason." However old, feeble, weak minded, capricious, notionate he may be, if he "be able to have a decided and rational desire as to the disposition of his property," he is not wanting in testamentary capacity. And in making the inquiry it would seem from the very words of the Code that attention is to be given, not so much to the state of the mind as an abstract philosophical or medical question, as to its capacity for the precise thing in hand. For a man may say and do things which a medical man would take as evidence of insanity, and yet it may be that he is nevertheless able to have a decided rational desire as to the disposition of his property.

3. Unquestionably this was an improper request. It is not for the Judge, but the jury to weigh the testimony. Whether any particular fact, if proven, is strong evidence of insanity or not, is strictly a question of the weight of evidence. And if evidence be competent, not immaterial, it must from the very nature of jury trials be for the jury, and not the Judge to say how much weight is to be given to it. We see no objection to this charge as to the right of a man to cut off any or all of his children if he see fit. It is true in fact that

this is the law. And we see no harm in thus informing a jury that a testator is free to do as he pleases. The words used by the Judge as to the meaning of the words "sound and disposing mind," are taken from the decisions of this Court in *Potts vs. House,* 6 *Georgia,* 324, and are nothing but the common language of the books upon the subject.

True this charge was not applicable to the issue of monomania. But the caveat went not only on monomania but insanity generally. It was the duty of the Judge to charge on the issues made. Nor could this charge mislead the jury, for he distinctly charged also and in full, on the law of monomania. As to the newly discovered evidence, what is it but other facts of the sayings and doings of the testator, of which the record is full. Doubtless, more still can be found. The evidence is strictly cumulative. There is a great deal of the same kind of evidence in the brief, and it is evidence exactly within the formal written issues that were tried. There is a limit to the indulgence the public gives to suitors. They have time given to prepare their cases. It is their duty to search all the probable depositories of the facts, and if they go to trial and lose, they cannot ask the country to give them a new hearing because they have found more facts of the same general tenor bearing upon the issue. The evidence discovered must be such as most probably would change the verdict. We cannot say that is so in this case. All these witnesses can prove may be so, and yet this verdict be right. We do not intend to go into an analysis of the evidence. We do not say the verdict is demanded by the evidence, but we do say that, in our judgment, a fair minded jury might come to this very conclusion, and not be open to the charge of prejudice, passion, corruption or mistake. We have no power to interfere with the judgment refusing a new trial, unless the verdict of the jury be illegal, and the judgment of the Judge exercising his legal discretion be also illegal.

Judgment affirmed.